Filed 5/24/24  P. v. Aguero CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>HECTOR AGUERO,<br><br>　　Defendant and Appellant. | H048899<br>(Monterey County<br>Super. Ct. No. 18CR008100) |
| In re HECTOR AGUERO,<br><br>　　on Habeas Corpus. | H051316 |

Appellant Hector Aguero was convicted by a jury of the second degree murder (Pen. Code, § 187, subd. (a))[1] of his infant son, Hector, Jr.,[2] as well as felony child abuse (§ 273a, subd. (a)), and felony assault on a child causing death (§ 273ab, subd. (a)).  The trial court sentenced him to an aggregate term of 36 years to life.

On appeal, Aguero raises the following claims of error: (1) the trial court erred by admitting evidence of uncharged domestic violence offenses and by failing to instruct the

---

[1] Unspecified statutory references are to the Penal Code.

[2] The parties referred to the child as "Baby Hector" throughout the trial to distinguish him from Aguero.   The jury instructions referred to him as "Hector Aguero III."

jury on the use of evidence of uncharged offenses; (2) the prosecutor committed error by referring to evidence outside the record, vouching for one of its witnesses, and commenting on Aguero's exercise of his constitutional right not to testify;[3] and (3) the cumulative effect of these errors warrants reversal. Finally, Aguero argues that the matter must be remanded for resentencing so that the trial court may exercise its discretion under recently amended section 654.

We reject Aguero's substantive arguments in their entirety, but we agree Aguero is entitled to resentencing under the amended version of section 654 and will therefore reverse the judgment and remand for that limited purpose.[4]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Charges, verdict, and sentencing

On July 23, 2019, the Monterey County District Attorney filed an information charging Aguero with two counts of felony child abuse (§ 273a, subd. (a); counts 1, 4),[5] felony assault on a child causing death (§ 273ab, subd. (a); count 2), and second degree

---

[3] Aguero also argues that he received ineffective assistance of counsel in relation to each of these claims. We address and reject on the merits his claim that there was prosecutorial error, and thus we need not and do not address the ineffective assistance argument related to that claim. However, we consider and reject his claim that counsel was ineffective for failing to: (1) request limiting instructions related to the evidence of uncharged domestic violence offenses; and (2) seek to admit additional portions of his interview with police in which he accused his former codefendant, Michelle Bautista La Fuente, of committing domestic abuse against him and their son.

[4] After briefing in Aguero's direct appeal was completed and oral argument scheduled, he filed a petition for writ of habeas corpus (H051316) that this court ordered to be considered with his appeal. We addressed the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

[5] Count 1 was based on child abuse that occurred "[o]n or between July 25, 2018 and July 28, 2018[,]" and count 4 was based on child abuse that occurred "[o]n or about August 7, 2018[.]" The prosecutor, in his trial brief, indicated that he intended to dismiss count 4 at the outset of trial. Although the record does not contain an order of dismissal, the charge was not presented to the jury.

2

murder (§ 187, subd. (a); count 3).[6] The information further alleged that, in connection with count 1, Aguero inflicted great bodily injury (GBI) on the victim, who was under five years of age (§ 12022.7, subd. (d)).

On October 30, 2020, the jury found Aguero guilty on counts 1 through 3 and found true the GBI enhancement allegations.

The trial court sentenced Aguero to an aggregate term of 36 years to life, consisting of an indeterminate term of 25 years to life on count 2, consecutive to the upper term of six years on count 1 plus five years for the associated GBI enhancement. The trial court imposed, but stayed pursuant to section 654, a term of fifteen years to life on count 3.

Aguero timely appealed.

### B. Factual background

#### 1. Prosecution's case

##### a. Events prior to July 27, 2018 hospital visit

Aguero began dating La Fuente in July 2016. About six months after they began dating, Aguero and La Fuente would argue "[t]hree to five days out of the week[]" and, during those arguments, Aguero would "hit [La Fuente] in anger." La Fuente stayed with

---

[6] Aguero's former codefendant, La Fuente, was also charged in the information on counts 2 (felony assault on a child causing death, § 273ab, subd. (a)) and 4 (felony child abuse, § 273a, subd. (a)). Before trial, La Fuente entered into a plea agreement whereby she pleaded to a misdemeanor charge of child abuse (§ 273a, subd. (b)) and being an accessory to a felony (§ 32). At Aguero's trial, La Fuente's plea bargain was introduced by stipulation of the parties.

On February 10, 2023, the Attorney General filed a request for judicial notice, requesting that the court take judicial notice of the June 26, 2019 minute order following the preliminary hearing at which the trial court found the evidence was not sufficient to support a charge of implied malice murder against La Fuente. By separate order, we deferred the request for judicial notice for consideration with the appeal. Having considered the documents, we deny the request as irrelevant to our resolution of the issue on appeal.

3

Aguero and did not report him to the police despite his physical abuse because she loved him and "believe[d] his promises" that he would stop.

For a short period of time, Aguero did stop hitting La Fuente once she and Aguero had a child together, Hector, Jr., on January 20, 2018.[7] In March, however, Aguero got angry at La Fuente and hit her in the jaw. La Fuente went to the emergency room because of the pain but, to protect Aguero, told hospital staff that she fell in the bathtub. Aguero accompanied La Fuente to the hospital that day because he had injured his hand. Medical personnel put a cast on his hand which prevented Aguero from being able to work. As he recuperated, Aguero stayed home with Hector Jr. while La Fuente was at work.

In April, La Fuente was alone with Hector Jr. when he rolled off the couch onto the floor. Although La Fuente did not see any bruises or bumps, she took him to the hospital as a precaution. The doctors who examined him told her Hector Jr. was fine but she could give him a pain reliever if necessary.

On separate occasions in either April or May, after leaving Hector Jr. with Aguero, La Fuente noticed bruising on Hector Jr.'s left cheekbone and left jaw. After La Fuente observed the second bruise, she asked her sister-in-law, A.M.,[8] to watch Hector Jr. when La Fuente had to work. When A.M. started babysitting Hector Jr. in early May, she took photographs of the bruising on his face.[9]

La Fuente testified that she and Aguero were not living together in April, May, and June. Aguero would call and visit La Fuente however and express his concern for her and Hector Jr. He would make sure that Hector Jr. had diapers, formula, and other

---

[7] Unless otherwise stated, all date references are to 2018.

[8] We will protect the personal privacy interests of the witnesses by referring to them by their initials only. (Cal. Rules of Court, rule 8.90(b)(10).)

[9] A.M.'s photos were entered into evidence and displayed to the jury.

necessities.  La Fuente reconciled with Aguero and they began cohabitating again in mid-July.  Aguero also resumed caring for Hector Jr. by himself when La Fuente was at work.

### b. July 27 hospital visit (count 1)

On July 27, La Fuente returned from work between 2:30 p.m. and 3:00 p.m.  She hugged Hector Jr., but when she touched the back of his head, he cried in pain.  La Fuente could feel a bump, about as large as the palm of her hand, on the back of Hector Jr.'s head.  La Fuente called her coworker, G.R., to give her and Hector Jr. a ride to the hospital.  Aguero initially did not want to go to the hospital, but La Fuente told him he needed to explain what happened since he was the only person at home with the child.  La Fuente's coworker testified that Aguero did not want to go to the hospital with La Fuente and Hector Jr. and, before he relented and got in her car, he appeared "kind of nervous."

On the way to the hospital, La Fuente's coworker asked Aguero what happened and, according to La Fuente, Aguero did not reply but just laughed.  The coworker testified that Aguero responded that Hector Jr. was playing and he fell backwards, hitting his head.  The coworker asked how he fell and Aguero said "just like that, like back" and then Aguero "kind of … laughed."

After they arrived at the emergency room, Aguero told La Fuente that Hector Jr. fell backwards and hit his head on a toy.[10]  At the hospital, doctors observed a bruise on the left rear side of Hector Jr.'s scalp and discharged him, without conducting any internal scans of his head, instructing La Fuente to ice the bruise and provide pain relievers as needed.  La Fuente was directed to return if Hector Jr. began vomiting or she observed changes in his behavior.

---

[10] When they returned from the hospital, Aguero showed La Fuente the toy he claimed Hector Jr. fell on, and a photograph of that toy was entered into evidence.

On the evening of August 6, La Fuente and Aguero were both at home with Hector Jr. As they were sitting on the floor, Hector Jr. fell backwards and hit his head against a partially eaten melon that was on the carpet. The impact was to the same part of his head that had previously been injured, and Hector Jr. began crying. La Fuente was able to console Hector Jr. and did not notice any swelling where he hit his head.

### c. August 7 hospital visit (counts 2, 3)

On the morning of August 7, before leaving for work, La Fuente fed Hector Jr. and put him in bed next to Aguero who was still sleeping. G.R. drove La Fuente to work.[11] Aguero and La Fuente shared a cell phone, so La Fuente left it at home with him while she was at work.

While at work, G.R. received a call from La Fuente's phone, so she handed her phone to La Fuente. When La Fuente answered the phone, Aguero told her she needed to come home because Hector Jr. was going to the hospital, then Aguero hung up. La Fuente called Aguero back multiple times before he answered. Aguero told her that Hector Jr. "was on the way to the hospital, and that he had … woken up crying." Aguero said he tried to calm Hector Jr. and feed him. According to La Fuente, Aguero said that he turned on the television, changed Hector Jr.'s diaper, but "all of a sudden [Hector Jr.] fainted in his arms." La Fuente had G.R. drive her to the hospital.

The ambulance arrived at the family's home at 9:52 a.m. A responding paramedic noted that Hector Jr. was pale, bleeding from his nostrils,[12] and his lips were blue. He

---

[11] La Fuente testified that G.R. picked her up between 7:30 a.m. and 8:00 a.m. that morning, but G.R. testified that they arrived at work at "six or seven" a.m. On cross-examination, La Fuente said that her work hours were from "seven to three in the afternoon."

[12] The paramedic did not observe any trauma to Hector Jr.'s face or nose that would explain the bleeding.

6

had no pulse and was not breathing. The paramedics began chest compressions, gave him oxygen, and transported him to the hospital.

When Hector Jr. came into the emergency room, he was not breathing and had no pulse. Hospital staff were able to restore his vital signs after several minutes, but it took two hours before his pulse and breathing were stabilized. Hector Jr. showed no neurologic activity, so the emergency room physician ordered a CT scan of his brain. A full examination of Hector Jr.'s body did not reveal any swelling or marks on his scalp, but there was "fairly extensive bruising over the lower back, buttocks[,] and upper legs." After Hector Jr. was stabilized, he was transferred to Lucille Packard Children's Hospital (Children's Hospital) at Stanford for more specialized treatment. Because of the nature of Hector Jr.'s injuries, hospital staff suspected they were non-accidental and contacted local law enforcement and child protective services (CPS).

The radiologist who reviewed Hector Jr.'s CT scans testified that there appeared to be bleeding in the brain that had either "happened before and didn't quite stop" or "it could be a repetitive injury that bled, … or something that bled and then stopped and then bled again." The radiologist observed a "fracture along the left parietal bone" on the "side back of the head." Finally, the radiologist noted that the CT imaging appeared to show more white than grey matter in Hector Jr.'s brain, indicating brain cells were dying from lack of oxygen, though it was difficult to tell.

Dr. Kelly Mahaney, a pediatric neurosurgeon, performed the initial neurological evaluation of Hector Jr. upon his arrival at Children's Hospital. She observed bruising on his thighs and buttocks and swelling and "bogginess" on the left rear of his scalp. Hector Jr. was comatose and on a ventilator. Dr. Mahaney administered a brainstem exam, looking for responses to various stimuli, but Hector Jr. showed no brainstem activity in that exam. She reviewed the CT scans performed at the hospital in Salinas and observed bilateral hemorrhages as well as loss of differentiation in gray and white cells in addition

to a skull fracture.  In Dr. Mahaney's experience, she had never seen "that significant of bruising and that significant of evidence of head injury from an accidental fall in a child this age."  After her initial assessment, Dr. Mahaney requested a non-accidental trauma workup for Hector Jr.  Dr. Mahaney explained that, in her work, they "do see cases where infants … come [in] with a skull fracture … [which] could result from … falling from a bed three or four … maybe three feet high.  [¶]  However it would be extremely rare to see a skull fracture in a comatose patient and with other signs of external trauma and to have that be simply from a fall from a bed."

On August 8, pediatric ophthalmologist Dr. Euna Koo examined Hector Jr.'s eyes.  Hector Jr.'s eyes were mid-dilated, which indicated he had suffered brain damage.  Dr. Kuo dilated Hector Jr.'s eyes further and discovered multiple hemorrhages—"too many" for her to count—and large macular schisis[13] cavities in both eyes.  The only plausible explanation for these injuries, in Dr. Kuo's experience, was non-accidental trauma.  The macular schisis cavities were consistent with Hector Jr. being repeatedly moved "forward-backward, forward-backward" with "quite a bit of force to create basically whiplash inside the eye."  Dr. Kuo was not confident in trying to place a time frame within which the injuries were inflicted beyond "at least a day or even a week" prior.

On August 11, following a second[14] brain death exam, Hector Jr. was declared dead.

### d. Autopsy results

Dr. Venus Azar, a pathologist, performed the autopsy and noted that Hector Jr. had a large bruise on his buttocks which extended to his upper thighs, and a smaller

---

[13] According to Dr. Kuo, a schisis is a separation between layers of the retina.

[14] Another physician testified that, "to declare somebody as brain dead, they must have two separate brain death exams performed by two separate practitioners at least 12 hours apart."  Dr. Mahaney performed the first brain death exam of Hector Jr. on August 10 and determined he was brain dead.

bruise on his back. Hector Jr. had a two-inch by one-inch bruise on the left rear side of his scalp and two more bruises on the middle part of his scalp, one towards the top of his head and the other lower down. Dr. Azar also discovered two skull fractures, both on the left side. One of the fractures was close to the base of the skull. According to Dr. Azar, a fracture near the base of the skull may damage the vessels that supply blood to the brain and the brainstem itself, which "controls respiration … blood pressure … [and] heart rate." The other fracture showed signs of healing which indicated it occurred before August 7 and thus was consistent with the injury that Hector Jr. had suffered on July 27.

Inside the skull, Dr. Azar observed bleeding on both sides of the front of Hector Jr.'s brain although there was no evidence of any blunt force trauma to the front of his head. Dr. Azar explained that such bleeding could be caused by a blow to the back of the head causing the brain to move within the skull and tear blood vessels, or by violent shaking. There were two areas of bleeding in Hector Jr.'s skull, one of which was approximately two weeks old and the other which was at most a few days old.

Dr. Azar opined that Hector Jr. died from "blunt force trauma and probably violent shaking." The injuries were inconsistent with a child falling backwards from a seated position onto the toy as described by Aguero or from a child again falling backwards from a seated position onto a partially eaten melon. According to Dr. Azar, the "manner of death" was homicide "because the injuries are classic for nonaccidental trauma or inflicted head trauma."

### e. Aguero's pre-arrest interview

When Aguero arrived at Children's Hospital, a CPS social worker met with him. Aguero agreed to an interview in a private room at the hospital. Aguero told the social worker that La Fuente had watched Hector Jr. the night before, but he was watching him the morning of August 7. Aguero said that he changed Hector Jr.'s diaper and fed him but the baby was crying. When asked about Hector Jr.'s head injuries, Aguero said he

9

did not know but the baby "had fallen on … a toy and hit the back of his head."  Aguero said that the bruising on Hector Jr.'s buttocks might have happened during the ride in the ambulance to the hospital.

Salinas Police Detective Ciro Barboza arrived at Children's Hospital between 8:00 p.m. and 9:00 p.m. on August 7.  Barboza saw "large bruises" on Hector Jr.'s "back, lower back, buttocks, and behind the legs" and was "shocked … to see that much bruising on the baby."  According to Barboza, the bruises on Hector Jr.'s buttocks were "larger and darker" than what was depicted in the photographs taken by a social worker at the hospital in Salinas that morning.

Barboza and another officer interviewed Aguero at Children's Hospital that same night.  Aguero said he was taking care of Hector Jr. that morning.  La Fuente had left for work without waking him, and he woke up when he heard Hector Jr. crying.  Aguero changed his diaper but did not see any bruises on the baby.  Hector Jr. continued to cry, so Aguero tried to feed him and turned on the television.  The baby was still restless but suddenly "stayed really calm" with his eyes open.  Aguero asked what was wrong and noticed Hector Jr. was struggling to breathe and sticking out his tongue.  Aguero went to his parents' room, told them Hector Jr. could not breathe, and they called 911.

Aguero later told the police that the night before, Hector Jr. had fallen backwards and hit his head.  Aguero did not see it happen, but La Fuente told him the baby hit his head on the rind of a melon Aguero had been eating.

Aguero admitted that he would sometimes get frustrated when Hector Jr. cried, but he never hit him or hurt him.  He also denied ever hitting La Fuente—aside from the time in March that he tried to hit her but hit a wall instead, breaking two fingers.

### f. La Fuente's prearrest interview

Detective Barboza also interviewed La Fuente on August 7.  Barboza recalled that La Fuente mentioned that she had seen Aguero get frustrated and impatient with Hector

10

Jr. when he cried. La Fuente told Barboza that she had seen bruises on Hector Jr.'s face in April and May when Aguero had been caring for him. La Fuente also told Barboza that she had been a victim of domestic violence from Aguero, but they did not go into detail on that subject during that interview.

During her videorecorded interview, La Fuente admitted spanking Hector Jr. "two days" prior to August 7. La Fuente demonstrated for the officers how hard she spanked him, and at trial described the contact as "little taps."[15] She then explained to the officers, "why am I gonna spank him if it's normal for them to cry? It's not — something could be, um, it's same thing that something could be hurting him. Why am I hitting him? For him to shut up? For him to, you know what, 'Oh, don't cry no more.'? I know that he's — he's barely learning about life so why am I gonna do something wrong with my baby?"

### g. Aguero's arrest and in custody interview

On August 24, 2018, the police arrested Aguero.

In a recorded interview after his arrest, Aguero initially continued to deny knowing how Hector Jr. was injured. Eventually, Aguero said that he was carrying Hector Jr. that morning and was still half asleep. He was looking for the baby's bottle, stumbled, and dropped Hector Jr. The baby hit his head on the floor,[16] but Aguero again denied that he hit him. After further questioning, Aguero admitted that he hit Hector Jr. three or four times, because he got frustrated that the baby would not stop crying. Aguero explained the baby would not stop crying that morning and cried more after Aguero dropped him. Aguero got exasperated and hit him with an open hand "very hard."

---

[15] This portion of La Fuente's interview was played in court so the jurors directly observed her demonstration of how much force she claimed to use.

[16] Aguero subsequently said that Hector Jr.'s body hit the floor before his head.

11

## 2. Defense case

The defense admitted several exhibits into evidence but called no witnesses.

## II.    DISCUSSION

### A. Admission of evidence of uncharged domestic violence offenses

Aguero raises various arguments related to the trial court's admission of evidence of uncharged acts of domestic violence.  First, he argues that admission of the evidence of domestic violence he committed against La Fuente violated his due process rights as it appealed to the implicit bias of jurors by suggesting that, as a Latino male, Aguero was necessarily violent and abusive.  Second, Aguero argues that the evidence had limited relevance and should have been excluded as it was more prejudicial than probative under Evidence Code section 352.  Third, Aguero contends that the trial court erred by failing to provide the jury with cautionary or limiting instructions on the use of this evidence in reaching a verdict on the charged offenses.  Fourth, he claims that the trial court improperly excluded evidence that La Fuente engaged in domestic violence against both Aguero and Hector Jr.  As discussed below, we disagree with Aguero's arguments in their entirety.

### 1. Aguero's implicit bias argument is not supported by the record

Aguero asserts that the propensity evidence raised implicit racial and gender stereotypes, specifically that young Latino males are prone to violence.  We do not dismiss out of hand the potential impacts of implicit bias as a general proposition.  However, Aguero does not point to anything in this record to demonstrate that explicit or implicit bias played a role in this trial.  (Cal. Rules of Court, rule 8.204(a)(1)(C).)  Allegations that are not supported by references to the record will be deemed forfeited.  (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745.)

12

### 2. No abuse of discretion in admitting uncharged acts of domestic violence

We next address Aguero's claim that the trial court erred by admitting the evidence of uncharged domestic abuse under Evidence Code sections 1109[17] and 352.

### a. Additional background

The prosecutor moved in limine to admit Aguero's prior history of domestic violence against La Fuente and Hector Jr. pursuant to Evidence Code section 1109. When the trial court inquired about the specific instances of domestic violence involving La Fuente, the prosecutor responded, "[I]n late 2017, [Aguero] hit her in the face during an argument. Another time they were arguing in early 2018 and he hit her in the face." With respect to Hector Jr., the prosecutor informed the court that there were "[t]wo separate instances, one in April and one in May where [] La Fuente left the baby with [Aguero] uninjured … and when she came back he had a bruise to his face under circumstances where the child is not mobile." Aguero also moved in limine to exclude that same evidence.

At the hearing on the parties' motions, the prosecution argued the evidence was relevant to establish Aguero's propensity to commit violence, identity, and to attack his credibility. In response, Aguero argued that admission of this evidence as propensity evidence would violate his due process rights, and also that it did not meet the criteria for admission as identity evidence because "it all circles back to propensity and whether or not because he engages in this pattern of violence against [] La Fuente specifically or the

---

[17] Aguero appears to argue that this court should reconsider whether admitting evidence of uncharged domestic violence under Evidence Code section 1109 violates a defendant's due process rights as a matter of course. As noted in *People v. Mani* (2022) 74 Cal.App.5th 343, 375 (*Mani*), "due process challenges to section 1109 have been repeatedly rejected. [Citation.]"

13

child … he's the likely person to engage in some fatal blows or the blows that led to the hospitalizations and ultimately [Hector Jr.'s] death."[18]

The trial court granted the prosecutor's motion, finding that "with respect to prior domestic violence, the two specific instances the People mentioned in late 2017 and early 2018, as well as a general history of domestic violence relating to arguments and resulting in violence . . . resulting from arguments, the Court will allow that under the rationale of [*People v. Dallas* (2008) 165 Cal.App.4th 940] … and Evidence Code [section] 1109." In addition to the domestic violence against La Fuente, the trial court allowed the introduction of evidence of "two incidents where the baby was bruised while in the defendant's care in April and May, … for the same reasons, propensity and identity." With respect to Aguero's credibility, the trial court reserved ruling on that basis depending on "how the evidence plays out."

At trial, and over defense counsel's continuing objection, La Fuente testified about both specific and generalized instances of domestic violence committed by Aguero. The first instance she described occurred in December 2016 while they were having dinner at her parent's home. La Fuente testified that Aguero seemed irritated and walked outside the house. She followed him and asked what was wrong, but he did not answer. Instead, Aguero punched her in the jaw. Later that evening, Aguero apologized and said he would not hit her again.

After they had been together for six months or so, La Fuente testified when she and Aguero would argue, he would hit her "[m]any times. Three to five days out of the week." Most of the time, Aguero would hit her in the face, causing "bruise[s], swelling,

---

[18] To the extent Aguero argues that the evidence of uncharged domestic violence offenses was improper under Evidence Code section 1101, subdivision (b) to establish identity or to attack his credibility, we need not address those claims since we conclude that the trial court properly admitted the evidence under Evidence Code section 1109.

14

bites on my lip." La Fuente stated that she did not leave Aguero "[b]ecause I continued to believe his promises that he would no longer do that, and I continued to love him, and because he said he was going to change." Once La Fuente gave birth to Hector Jr., the domestic violence briefly ended.

In March 2018, a few months after Hector Jr. was born, La Fuente and Aguero were renting a room in a larger house. La Fuente returned home and the landlord told her that Aguero had caused a problem with another tenant so she and Aguero would have to move. La Fuente spoke to Aguero and asked him to explain what happened, but he refused to answer her. When she continued to question him, Aguero became angry and hit her in the jaw, injuring his right hand.

Detective Barboza's testimony about his recorded interviews with La Fuente and Aguero included some brief references to Aguero's domestic violence, supported by video clips of those interviews. Specifically, Barboza confirmed that La Fuente was consistent in her two interviews at the hospital and at the police station that Aguero had hit her. Barboza testified that Aguero told different stories about this subject during his interviews. At first, Aguero denied that he ever hit La Fuente but later admitted that he had indeed assaulted and injured her.

Neither party asked for instructions on the Evidence Code section 1109 evidence. As a result, the jury was not instructed with CALCRIM No. 852A on evidence of uncharged domestic violence or with CALCRIM No. 375 on evidence of uncharged offenses. The jury was instructed with CALCRIM No. 303 on limited purpose evidence.

In final argument, the prosecutor told the jury that the evidence of Aguero's domestic violence against La Fuente supported two conclusions: (1) it was Aguero, not La Fuente, who injured and killed Hector Jr. because Aguero had a history of violently lashing out when frustrated; and (2) Aguero was not credible given his conflicting

15

statements about that domestic violence and his conflicting statements about hitting Hector Jr.

### b. *Applicable legal principles*

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159; Evid. Code, § 1101, subd. (a).) However, the Legislature has created certain exceptions to the prohibition against admitting propensity evidence in cases involving sexual offenses (Evid. Code, § 1108, subd. (a)) and domestic violence (*id.*, § 1109, subd. (a)(1)).

Evidence Code section 1109, subdivision (a)(1) provides, as follows: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (Evid. Code, § 1109, subd. (d)(3).) Under Family Code section 6211, subdivision (e), domestic violence includes abuse committed against "[a] child of a party."

The California Supreme Court has previously rejected the argument that Evidence Code section 1108 violates a defendant's right to due process in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*). *Falsetta* held that "the trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence Code] section 1108 from [a] due process challenge." (*Id.* at p. 917.) Although the California Supreme Court has not specifically ruled on the constitutionality of Evidence Code section 1109—

16

a parallel provision to Evidence Code section 1108—Courts of Appeal have consistently concluded that Evidence Code section 1109 does not violate principles of due process under the reasoning in *Falsetta*. (See, e.g., *Mani, supra,* 74 Cal.App.5th at p. 376; *People v. Hoover* (2000) 77 Cal.App.4th 1020; *People v. Johnson* (2000) 77 Cal.App.4th 410, 420.)

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438.)

When engaging in a "careful weighing process under [Evidence Code] section 352 . . . trial judges must consider such factors as [the evidence's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other [] offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) Nevertheless, the determination is "entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence." (*Id.* at pp. 917–918.) A trial court's exercise of discretion under section 352 will not be overturned "in the absence of manifest abuse,

17

upon a finding that its decision was palpably arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314 (*Jennings*).)

### c. Analysis

Here, the prosecution offered the evidence of Aguero's uncharged domestic violence against La Fuente under Evidence Code section 1109, in order to show his propensity to engage in domestic violence, specifically child abuse, against Hector Jr. Before permitting the prosecution to admit this evidence, the trial court evaluated it under Evidence Code section 352, determining that its probative value was not substantially outweighed by its potential prejudice. As explained below, we conclude that the trial court did not abuse its discretion in admitting the evidence.

An important and relevant consideration in the section 352 analysis was the fact that Aguero corroborated some of the uncharged domestic violence allegations when he admitted in his recorded interview that he struck La Fuente when they argued.

The uncharged offenses were also relevant and sufficiently similar in nature to the charged offenses. " ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' " (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531; *Falsetta, supra*, 21 Cal.4th at p. 917 [trial court should consider factors including "similarity to the charged offense"].) La Fuente testified that Aguero would argue with her, become angry, then strike her in the face. As Aguero admitted to police, he became frustrated and exasperated with Hector Jr. when he would not stop crying after Aguero dropped him, so he hit Hector Jr. "very hard" with an open hand three or four times. While there are dissimilarities between the uncharged and charged offenses, most notably the victims' differences in age and gender, "dissimilarity alone does not compel exclusion of the evidence." (See *People v. Cordova* (2015) 62 Cal.4th 104, 133 [addressing admissibility of uncharged sex offenses under Evidence Code

18

section 1108].) In this case, Aguero's prior acts of domestic violence provided evidence of a propensity to react angrily and violently when angered in the home.

The evidence of domestic violence against La Fuente was neither inflammatory nor remote in time. La Fuente testified that her injuries consisted of "bruises, swelling, [and] bites on my lip." It is difficult to imagine that a jury would convict Aguero of killing his child in order to punish him for inflicting the injuries La Fuente described.

As for the remoteness of the incidents, La Fuente testified generally that Aguero hit her often over the course of their relationship during arguments but also described two instances of domestic violence in more detail. The first of these took place in December 2016, two years prior to Hector Jr.'s death, and the second occurred in March 2018, just five months before the crime. Evidence Code section 1109, subdivision (e) provides that "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." Both of the incidents specifically described by La Fuente took place well within the 10 year period allowed for under Evidence Code section 1109.[19]

We are not persuaded, as Aguero argues, that evidence that La Fuente was violent toward him and Hector Jr. should have been admitted under the "rule of completeness" in Evidence Code section 356.[20] That statute provides, in relevant part, "when a detached . . . declaration [or] conversation . . . is given in evidence, any other . . . declaration [or] conversation . . . which is necessary to make it understood may also be given in evidence." (Evid. Code, § 356.) Evidence Code section 356 is the statutory version of

---

[19] La Fuente and Aguero began dating in July 2016 so even the generalized acts of domestic violence she described would necessarily have taken place within 10 years.

[20] Assuming arguendo Aguero did not forfeit or waive Evidence Code section 356 as a ground for admission of the proffered statements, we conclude the trial court did not err by implicitly finding they were not admissible on that ground.

19

the common law rule of completeness.  (*People v. Parrish* (2007) 152 Cal.App.4th 263, 269, fn. 3 (*Parrish*).)  When one party places in evidence one part of a conversation or statement, the other party may place the remainder of that conversation or statement in evidence provided those other statements have some bearing on, or connection with, the admission or declaration in evidence.  (Evid. Code, § 356; *People v. Zapien* (1993) 4 Cal.4th 929, 959.)  For admission under Evidence Code section 356, those other statements must be on the same subject or must be necessary to understand the original statements already admitted.  (*People v. Maury* (2003) 30 Cal.4th 342, 419 (*Maury*).)  We review a trial court's ruling under Evidence Code section 356 for abuse of discretion.  (*Parrish*, at p. 274.)  Aguero's admission that he struck La Fuente multiple times when they argued was unambiguous and needed no clarification or context to "make it understood."  (Evid. Code, § 356; *Maury*, at p. 419.)

Accordingly, the trial court did not abuse its discretion in admitting the evidence of Aguero's uncharged domestic violence.  The trial court engaged in the weighing process required by Evidence Code section 352 and admitting the uncharged domestic violence evidence did not violate Aguero's due process rights.  (*Mani*, *supra*, 74 Cal.App.5th at p. 376.)

### d. No prejudice

Even assuming the trial court erred in admitting the evidence of uncharged domestic violence, Aguero cannot show he was prejudiced by its introduction.

Aguero initially argues that we should evaluate any error in admitting this evidence under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).[21]  He then acknowledges that, in the absence of a federal constitutional

---

[21] Under *Chapman*, the burden would be on the Attorney General to show that the error was harmless beyond a reasonable doubt.  (*Chapman, supra, 386 U.S.* at p. 24.)

violation, any claim of error in admitting evidence is evaluated under the *Watson*[22] standard. We do not find any violation of the U.S. Constitution, and thus we apply *Watson*. (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test"].) Under *Watson*, the burden falls on Aguero to show a reasonable probability that, absent the error, he would have achieved a more favorable result at trial. (*Watson*, *supra*, at p. 836.) Given the weight of the other evidence establishing Aguero's culpability, discussed below, no such reasonable probability can be shown.

First, Aguero admitted that, on August 7, he dropped Hector Jr. on his head and struck him "very hard" multiple times when Hector Jr. would not stop crying. When asked about Hector Jr.'s significant bruises, Aguero said that he saw no such bruising on the baby when he changed his diaper that morning.

Second, Aguero was alone with Hector Jr. when he was injured, both on July 27, and on August 7. G.R. corroborated La Fuente's testimony that Hector Jr.'s injuries occurred when La Fuente was at work.

Third, La Fuente's testimony regarding how Hector Jr. would get bruises on his face when Aguero took care of him in April and May was also corroborated by A.M. A.M. took photographs of those bruises which were displayed to the jury.

Given the strength of the evidence of Aguero's guilt, it is not reasonably probable that the jury would have returned a different verdict absent the evidence of uncharged domestic violence.

---

[22] *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

21

### 3. No instructional error

Aguero next contends that the admission of the uncharged offenses evidence was error due to the trial court's failure to instruct the jury with CALCRIM No. 852A on how to treat that evidence in its deliberations. We disagree.

As a threshold matter, the Attorney General argues that Aguero forfeited his claim of instructional error by failing to request the relevant instructions at trial. However, because Aguero contends the failure to instruct on the use of the uncharged offenses evidence affected his substantial rights, we decide that we can consider the merits of his claim in spite of the failure to request such instructions. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312.)

### a. Applicable legal standards

"[T]he trial court ordinarily has no sua sponte duty to instruct the jury as to the admissibility or use of other crimes evidence. [Citation.]" (*Falsetta*, *supra*, 21 Cal.4th at p. 924.) However, in the "occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. … the evidence might be so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence." (*People v. Collie* (1981) 30 Cal.3d 43, 64 (*Collie*).)

### b. Analysis

Aguero's claim fails because it is not reasonably probable that the jury would have reached a different verdict even if they had been given the instruction in question. (*Falsetta*, *supra*, 21 Cal.4th at p. 925 [*Watson* standard applies to uncharged crimes evidence].)

CALCRIM No. 852A informs the jury that it may only consider evidence of uncharged domestic violence to prove the defendant's propensity to commit such

22

offenses, domestic violence, if the prosecution proves, by a preponderance of the evidence, that the described domestic violence took place.[23] Like in *Jennings*, *supra*, 81 Cal.App.4th at p. 1318, instructing the jury here with CALCRIM No. 852A "would have added virtually nothing to the reasonable doubt and other instructions actually given by the trial court aside from emphasizing to the jury the existence of the prior abuse evidence and its potential use as evidence of [Aguero]'s predisposition to commit the charged crimes." "[T]he instruction would have specifically pointed out to the jury that the evidence of [Aguero]'s prior acts of domestic abuse against the victim could be used as evidence that ' ". . . he has a trait of character that predisposes him to commission of certain crimes, . . ." ' and moreover that the jury could ' ". . . use that evidence that [he] committed another offense for the limited purpose of deciding whether he has a particular character trait that tends to predispose him to the commission of *the charged offense*. . . ." ' [Citation.]" (*Ibid*., italics added by *Jennings*.)

---

[23] CALCRIM No. 852A informs the jury how to evaluate evidence of uncharged domestic violence as follows: "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit [and did commit] *<insert charged offense[s] involving domestic violence>*, as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of *<insert charged offense[s] involving domestic violence>*. The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt."

23

In this case, there was little dispute over the prior uncharged domestic violence, since Aguero admitted, in his videorecorded interview, that he hit La Fuente on two occasions when they argued. Based on Aguero's statements in clips played for the jury, it was reasonable to infer that he had hit La Fuente on multiple occasions when they argued. Aguero said that he hit her with his fist, saying, "I made her bleed from the mouth," and "her lip got swollen." In light of these admissions, the failure to instruct the jury on how to consider such evidence was harmless.[24]

The failure to instruct was also not prejudicial given the evidence of Aguero's guilt, as detailed above in section II.A.2.d.

### 4. No ineffective assistance for not requesting limiting instructions

Aguero also argues that, assuming the trial court had no duty to instruct the jury with CALCRIM No. 852A, his trial counsel was constitutionally ineffective for failing to request that instruction. As discussed below, we disagree.

To prevail on an ineffective assistance of counsel claim, a defendant must establish that trial counsel's performance was deficient, and that defendant suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674] [defendant must establish both deficient performance of counsel and resulting prejudice to prevail on ineffective assistance of counsel claim].) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) Regarding prejudice, a "defendant must

_____

[24] While we conclude that this was not one of the "occasional extraordinary case[s]" foreseen in *Collie*, *supra*, 30 Cal.3d at p. 64, and thus the court had no sua sponte duty to provide a limiting instruction to the jury, we think trial courts should strongly consider taking the position that they will, absent objection, give appropriate limiting instructions when evidence of uncharged offenses is admitted.

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Based on the record in this case, trial counsel may reasonably have understood that the jury would find that Aguero's admissions to committing domestic violence against La Fuente would more than meet the preponderance of the evidence standard for considering this evidence. Although CALCRIM No. 852A also contains language which limits how jurors can use such evidence in determining whether a defendant is guilty of the charged offenses, counsel may have reasonably concluded, on balance, that the jury instruction would only serve to underscore the jury's ability to use such propensity evidence to prove his guilt. Because the record does not affirmatively disclose counsel had no rational tactical purpose for not requesting the instruction, he was not asked the reason and failed to provide one, or there simply could be no satisfactory explanation, we do not find that counsel provided ineffective assistance in this regard.

### 5. *No ineffective assistance for not seeking admission of police interviews*

Aguero next claims that he received ineffective assistance of counsel for not seeking admission of Aguero's full interview with the police, in which he made statements accusing La Fuente of abusing Hector Jr. We reject this argument as Aguero cannot show that counsel was ineffective or, if he were, that he was prejudiced by defense counsel's failure.

25

The record here does not provide an explanation for counsel's decision to not seek admission of the entirety of Aguero's recorded interview with police, but we cannot say counsel had no satisfactory reasons for making that choice. First, Aguero's accusations of abuse by La Fuente were hearsay, and counsel cannot be ineffective for not seeking to introduce inadmissible evidence. (See *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["Counsel is not ineffective for failing to make frivolous or futile motions."].)

Second, Aguero's interviews contained many inconsistent and contradictory statements, along with implausible explanations for how Hector Jr. was injured. A reasonable attorney would consider that the jury would find Aguero to be less credible after watching the full interviews and would view his statements attempting to shift blame onto La Fuente as both untruthful and self-serving. Not seeking to admit these interviews for such a reason would have been a reasonable tactical decision.

Moreover, as discussed in detail above, Aguero cannot show prejudice from counsel's decision because the evidence of his guilt, especially his admissions that he not only dropped Hector Jr. but struck him "very hard" several times, was extensive.

### 6. No prosecutorial error

Aguero next argues that the prosecutor committed error during final argument by arguing facts outside the record, vouching for La Fuente's credibility, and by improperly commenting on the fact that Aguero elected not to testify. Aguero also contends that defense counsel's failure to object to the prosecutor's conduct constituted ineffective assistance of counsel.

The Attorney General first argues that Aguero has forfeited this argument because his trial counsel failed to object below. As to his alternative claim of ineffective assistance of counsel, the Attorney General contends that: (1) trial counsel's failure to object did not amount to ineffective assistance; and (2) Aguero cannot establish that he was prejudiced by the failure to object.

26

Although defense counsel did not object and therefore forfeited the claim, we address the merits, given Aguero's alternative argument that his trial counsel was constitutionally ineffective. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125– 1126.) Our review of the record satisfies us that no error occurred.

### a. Applicable legal standards

" 'Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " (*People v. Bell* (2019) 7 Cal.5th 70, 111.) A prosecutor engages in prosecutorial misconduct under state law if he or she uses deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

" 'It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567.) When evaluating the propriety of a prosecutor's remarks or comments made before the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) To find prosecutorial error, we must view the challenged statements in the context of the entire argument and the jury instructions to determine whether there was a reasonable likelihood the jury understood or applied the comments in an improper or erroneous manner. (*People v. Cortez* (2016) 63 Cal.4th 101, 130–131 (*Cortez*).) "If the challenged comments, viewed in context, 'would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable.' " (*Id.* at p. 130.) " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v.*

*Centeno* (2014) 60 Cal.4th 659, 667.) " '[W]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Osband* (1996) 13 Cal.4th 622, 717.)

### b. Reference to evidence outside record

Aguero first points to a portion of the prosecutor's rebuttal argument as implying to the jury that there were other witnesses who could corroborate La Fuente's evidence of domestic violence, specifically the following: "And with me bringing up corroboration of this domestic violence, I thought about it. But why do I need to go pull witnesses to prove she's a victim of domestic violence when he says he's hit her and given her injuries? That's a waste of resources. It's a waste of your time. It's a waste of county resources."

These statements, however, were made in response to defense counsel's final argument that the jury should reject La Fuente's "story of being abused three to five times a week" because there was no "corroboration of this[,]" no "pictures[,]" or "hospital visits." The prosecutor did not, as Aguero suggests, inform the jury that there were photos or hospital records or other evidence outside the record to support La Fuente's testimony. Instead, the prosecutor continued by directly challenging Aguero's assertion that "there is no corroboration[]" by pointing out that Aguero's "confession [to domestic violence] is a corroboration." The prosecutor's statements about corroborating the evidence of domestic violence were thus both a fair response to defense counsel's argument and a fair comment on the evidence presented at trial.

### c. Vouching

Aguero next contends that the prosecutor improperly referred to the "reasons" behind La Fuente's plea bargain in order to vouch for La Fuente's credibility. We disagree.

28

"[A] 'prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.' [Citation.]" (*People v. Turner* (2004) 34 Cal.4th 406, 432–433.) " 'However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [the prosecutor's] comments cannot be characterized as improper vouching.' [Citation.]" (*People v. Stewart* (2004) 33 Cal.4th 425, 499, italics omitted.)

In making his vouching argument, Aguero cites to the following portions of the prosecutor's rebuttal argument to the jury: "[I]n terms of this case against mom with the deal she got, there are reasons for plea bargaining beyond anything that's relating to man's guilt [*sic*]. There is information that goes into this that's not given to you because it's not for you to make your decision. [Defense counsel] is well aware of why she got the exact charges. He knows why. There's no—but it's not relevant to this case. [¶] … [T]here is no way on God's green earth that I can prosecute that woman for the direct infliction of abuse, causing the death of that child. Because this is actually a great example of the thing that judge told you at the beginning of this trial. Just because someone is charged and arrested doesn't—that's not evidence of guilt. Sometimes things change. Sometimes different DAs have different perspectives."

What Aguero fails to acknowledge is that the prosecutor's remarks were in direct response to defense counsel's closing argument, in which he suggested that if La Fuente had testified truthfully, she was not guilty of any crime, even the crimes to which she pleaded. Because the prosecution still threatened her with prison time, La Fuente only entered into the plea agreement in order to "save her skin" and provide false testimony

29

against Aguero.[25]  The prosecutor's rebuttal statements were a fair response to defense counsel's (arguably misleading) statements implying that La Fuente's testimony implicating Aguero was coerced by the threat of significant prison time.

Furthermore, the prosecutor did not end his remarks there, but continued by recounting the evidence that supported La Fuente's credibility and lack of culpability for Hector Jr.'s injuries.  For example, La Fuente took Hector Jr. to the hospital on April 10 after he fell off the couch despite his lack of apparent injuries, demonstrating she acted out of care for the child rather than concern over whether she might be suspected of child abuse.  La Fuente did so again on July 27 when she came home, after leaving Hector Jr. alone with Aguero, to discover the large lump on the left rear side of his head.  The prosecutor also reminded the jury that La Fuente's testimony was consistent, whereas Aguero's was not, and further, that Aguero admitted to hitting Hector Jr. on August 7 out of frustration.

The prosecutor's comment that he and defense counsel were aware of the reasons why La Fuente was offered a plea bargain was not vouching for La Fuente's credibility. He expressly informed the jury that the reasons for La Fuente's plea bargain were not relevant to the task before it.  Instead, the prosecutor reminded the jurors of all the evidence presented to them that would let them draw their own conclusions about La Fuente's credibility.  The prosecutor did not argue that the jury should find La Fuente credible because of her plea agreement, but rather because her prior interviews and her testimony were consistent throughout.

---

[25] In his brief, Aguero makes the following assertion: "[La Fuente] obtained her plea agreement after the prosecution promised not to seek a murder charge, the same charge found to be supportable against her by the magistrate at the preliminary hearing." This mischaracterizes the record.  At the close of the preliminary hearing, the magistrate expressly stated that he would *not* hold La Fuente to answer for implied malice murder if the prosecution sought to bring such a charge against her.

Because the prosecutor did not vouch for La Fuente's credibility and informed the jury that the reasons for her plea agreement were not relevant to the proceedings against Aguero, it is not reasonably likely the jury understood or applied the comments in an improper or erroneous manner. (*Cortez*, *supra*, 63 Cal.4th at pp. 130–131.)

### d. No **Griffin** error

Aguero's final claim of prosecutorial error is that the prosecutor twice improperly commented on his failure to testify in violation of the rule set forth in *Griffin v. California* (1965) 380 U.S. 609, 615 (*Griffin*). The initial commentary consisted of the following remarks: "[Aguero] does not have to testify. It's his constitutional right. It cannot be held against him. But if that is the route they choose to go, [defense counsel] has to get up here and testify for his client and start bringing things that no one has discussed, no one has alleged, and there's no evidence to pull that from." A few minutes later, the prosecutor stated that, on July 27, Aguero "bashed that kid's head in. I can't tell you how exactly, but he lost his cool. … [¶] And on August 7th, … [¶] … I have no doubt he was groggy, looking for a bottle, and probably dropped the baby. … [¶] … And so the man with the admitted anger issues and frustration problems … lost control and … spanked the baby very hard. [¶][¶] And he [shook] the hell out of this kid. Maybe bashed his head on something."

In the second instance, the prosecutor stated: "[Y]ou have no evidence from any source, from either of the adults that were in that room that day that anything happened prior to [Aguero] waking up. You don't have it from [La Fuente]. You don't have it from [Aguero]."

### i. Applicable legal standards

*Griffin* established that the Fifth Amendment of the United States Constitution forbids "comment by the prosecution on the accused's silence." (*Griffin, supra*, 380 U.S. at p. 615; *U.S. v. Robinson* (1988) 485 U.S. 25, 32, 108 S. Ct. 864, 99 L. Ed. 2d 23

31

[*Griffin* prohibits " '[the] prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt.' "].)  "Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf.  [Citations.]" (*People v. Hughes* (2002) 27 Cal.4th 287, 371–372.)  The California Supreme Court has also suggested "that it is error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide.  [Citation.]  But although ' "*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand," ' the prohibition ' "does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses." ' [Citation.]" (*Id.* at p. 372.)  Claims of *Griffin* error are evaluated by inquiring whether there is a reasonable likelihood that a prosecutor's remarks would have been understood as referring to a defendant's failure to testify.  (*People v. Clair* (1992) 2 Cal.4th 629, 662 (*Clair*).)

### ii. Analysis

Again, the remarks which in Aguero's view constituted *Griffin* error were made during the prosecutor's rebuttal.  In his final argument, defense counsel argued that it was La Fuente who "inflicted these injuries [on Hector Jr.] before she went to work on August 7 and placed an unconscious baby next to my client."  When Aguero woke up, Hector Jr. "waxed and waned" while Aguero "tried to treat the baby as if nothing was wrong because he didn't know anything was wrong.  He gave the baby stimuli, normal loving fatherly stimuli where he changed the diaper.  He tried to give the baby food.  The baby did not respond.  He tried to wake the baby.  The baby was in cardiac arrest.  And he called 911."

The prosecutor's rebuttal was directly responding to defense counsel's accusations that it was La Fuente, rather than Aguero, who injured Hector Jr., pointing out to the

32

jurors that there was no evidence supporting defense counsel's version of what happened that morning. Instead, as the prosecutor argued in rebuttal, the evidence was that Aguero was the one who dropped Hector Jr. on August 7 and, in frustration at the baby's continued crying, hit him "very hard" in the face multiple times. Aguero himself admitted these facts. The prosecutor also rebutted defense counsel's version of events by pointing the jury to the evidence that Hector Jr. had suffered severe injuries that morning, and if La Fuente had inflicted them, it was highly unlikely that Aguero would not have woken up.

Based upon the record, it is not reasonably probable that the jury understood the prosecutor's remarks about the lack of evidence supporting defense counsel's version of what occurred to be a comment on Aguero's failure to testify. (See *Clair, supra*, 2 Cal.4th at p. 662.)

Even if the prosecutor's rebuttal statements indirectly violated *Griffin*, we would conclude that the error was harmless. "[I]ndirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error." (*People v. Hovey* (1988) 44 Cal.3d 543, 572.) The trial court instructed the jury that Aguero "has an absolute constitutional right not to testify[]" and that it should "not consider for any reason at all the fact that [Aguero] did not testify." The jury was also instructed that "[n]othing the attorneys say is evidence" and, while they may discuss the case during final arguments, "their remarks are not evidence." We presume the jury understood and correctly applied these instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 677.)

For all of these reasons, we conclude that the prosecutor's statements in opening and rebuttal argument did not constitute reversible error under *Griffin.*

### 7. No cumulative error

Aguero next contends that the cumulative effect of the purported errors discussed above warrants reversal of the judgment. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) Here, we have found no errors, and where we assumed error, we also found no prejudice. Consequently, we reject Aguero's cumulative error argument.

### 8. Amendment to section 654

Finally, Aguero argues that the matter must be remanded for resentencing on counts 2 and 3 so that the trial court may exercise its discretion under recently amended section 654. The Attorney General concedes that remand is appropriate and we agree that the concession is well-taken.

Section 654 prohibits multiple punishments for a single act or omission. (See *People v. Delgado* (2017) 2 Cal.5th 544, 570.) At the time of Aguero's sentencing, section 654 required the trial court to punish a defendant "under the provision that provide[d] for the longest potential term of imprisonment." (§ 654, former subd. (a).)

Effective January 1, 2022, section 654 was amended by Assembly Bill No. 518 to give the trial court discretion to select the provision under which a defendant would be punished. As relevant here, section 654 now provides, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a), italics added.)

The amendment of section 654 effected an ameliorative change to the law as trial courts are no longer required to impose sentence under the provision that provides for the longest term of imprisonment when a defendant is convicted of multiple crimes for a single act or omission. When a court has imposed a sentence while unaware of the extent

34

of its discretion—in this case because the legislation was not yet in effect—resentencing is required unless the record clearly indicates the court would have imposed the same sentence under the new standard. (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1096.)

We agree with the parties that Aguero is entitled to the retroactive application of amended section 654 because there is no indication that the Legislature intended the law to apply prospectively only, and this case is not yet final. (See, e.g., *Mani, supra,* 74 Cal.App.5th at pp. 379–380; *People v. Mendoza* (2022) 74 Cal.App.5th 843, 861–862.) In addition, the record does not indicate that the trial court would, exercising its discretion under the amended version of section 654, impose the same sentence in this case as it originally imposed a lesser (stayed) term on count 3.

We will therefore remand the matter for resentencing under amended section 654.

### III. DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court to resentence Aguero under the amended version of Penal Code section 654.

_____
          Wilson, J.



WE CONCUR:




_____
      Greenwood, P. J.




_____
      Grover, J.




*People v. Aguero*
H048899
*In re Hector Aguero on Habeas Corpus*
H051316